Lizabeth M. Conran, *pro hac vice*
lmc@greensfelder.com
David M. Harris, *pro hac vice*
dmh@greensfelder.com
David Simmons, *pro hac vice*
ds@greensfelder.com
10 S. Broadway, Suite 2000
St. Louis, MO  63102
Phone:  (314) 241-9090
Fax:  (314) 345-5488

Attorneys for Defendant BP West Coast
Products LLC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Oil Holdings, LLC, et al., | |
| Plaintiffs, | No. 2:14-cv-00569-GMS |
| v. | |
| BP West Coast Products LLC, | **MOTION FOR SANCTIONS AND MEMORANDUM IN SUPPORT** |
| Defendant. | **ORAL ARGUMENT REQUESTED** |

Plaintiffs filed this lawsuit in March 2014 seeking hundreds of millions of dollars in damages from BP West Coast Products, LLC ("BPWCP") for a myriad of claims relating to the termination of their franchises, the pricing of gasoline, and various other alleged breaches of contract.  Plaintiffs anticipated filing this lawsuit no later than May 31, 2013, when they sent a preservation letter to BPWCP requesting that BPWCP preserve all documents beginning in January 2006 until present to "ensure that all relevant documents have been searched for, collected, and preserved" for this litigation.  Nevertheless, Plaintiffs failed to issue their own litigation hold or to take the necessary steps to "search[] for, collect[], and

preserve[]" the relevant documents for this litigation.  Indeed, Plaintiffs' key employees testified that they did not receive any instruction regarding preserving or collecting their documents for production in this case.  For instance, Plaintiffs' General Manager and Chief Financial Officer both testified that they were in possession of voluminous collections of financial documents relating to Plaintiffs' Arizona operations that were never collected or produced.  In fact, some e-mails were destroyed as recently as two months ago because the information was not timely collected and Plaintiffs' General Manager was not instructed to preserve his e-mails.  Other employees were permitted to self-select which documents they thought were relevant despite lacking knowledge of the claims and defenses in the case.

Plaintiffs' abject failure to preserve and produce documents relevant to the claims and defenses in this case was grossly negligent and indicates bad faith.  Furthermore, if not rectified, it will likely prejudice BPWCP's ability to defend itself in this matter.  At the very least, it will create undue burden and expense on BPWCP and result in significant delays in the litigation.

Based on this conduct, as more fully set forth below, BPWCP is entitled to sanctions as set forth in the conclusion of this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    BACKGROUND.**

**A.    Plaintiffs' And Mr. Stevens.**

Plaintiffs Arizona Oil Holdings, LLC and the six LLC's for each of the six stations at issue in this case were all owned and managed by Mr. Russell Scaramella.  (Docket No. 25 at ¶¶1-8.)  Mr. Scaramella has been operating multi-million dollar businesses since 1997, and

claims that at its height, his fuel delivery and gasoline station business was bringing more than $1 billion in revenue.  (Deposition of Russ Scaramella, Vol. I, relevant portions of which are attached as **Exhibit A**, at 100:18-21 at pp. 11 and 45.)  Since 2000 when Mr. Scaramella opened his first ARCO station in Arizona – Mr. Scaramella claims to have purchased more than $750,000,000 in gasoline from BPWCP over approximately 12 years. (Docket No. 25 at ¶ 65.)  Mr. Scaramella, at all times, was the managing member of the Plaintiff companies, and he was responsible for the overall operations of all of the gasoline stations in Arizona, Georgia, and Florida.  (Id. at ¶ 8.)[1]

**B.   Plaintiffs' Knowledge Of Their Lawsuit And Their Claims.**

On May 31, 2013, just two weeks after BPWCP terminated Plaintiffs' franchises, Plaintiffs' counsel, Don Stevens, sent BPWCP a detailed eight-page letter informing BPWCP of its obligations to "take reasonable steps to preserve all information" and "to ensure that all relevant documents have been searched for, collected and preserved for production during subsequent litigation with [BPWCP]."  (May 31, 2013 Preservation Letter from Don Stevens to Derek Tomita, attached hereto as **Exhibit A1**, at 1-2.)  Thus, Plaintiffs knew in May 2013 that this litigation was imminent.  Over nine months later, on March 19, 2014, Plaintiffs filed a nine-count Complaint against BPWCP and BP Products North America Inc. seeking more than $250,000,000 in damages.

---

[1] Mr. Don Stevens, Plaintiffs' attorney, is an experienced attorney in the Phoenix, AZ area and has been involved with this case since at least May 2013.

**C.      Plaintiffs' Duties Regarding Preserving And Producing Documents And BPWCP's Initial Concerns And Attempts To Resolve Those Concerns.**

Plaintiffs had a duty to preserve relevant documents for this lawsuit as early as May 31, 2013 when they sent BPWCP the preservation letter.[2] Perez-Garcia v. P.R. Ports Auth., 871 F. Supp. 2d 66, 69 (D. P.R. 2012) (a party has the duty to preserve relevant documents once it "has notice, or should foresee, that a lawsuit is or will be initiated").  Plaintiffs' duty to preserve relevant documents extends to documents in their former employees' possession or control.  See, e.g., Export–Import Bank of the United States v. Asia Pulp & Paper Co., Ltd., 233 F.R.D. 338, 341–42 (S.D.N.Y.2005).

Fed. R. Civ. P. 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment).  "[W]hat is reasonable is a matter for the court to decide on the totality of the circumstances." Id.  As the Advisory Committee explained, "[i]f primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." Id.  For the current "good faith" discovery system to function in the electronic age, attorneys and clients must work together to ensure that both understand how and where electronic documents, records and emails are maintained and to determine how best to locate, review, and produce responsive documents.  Qualcomm Inc. v. Broadcom Corp., 2008 U.S. Dist. LEXIS 911, (S.D. Cal. January, 7, 2008).  Attorneys must take responsibility for ensuring that their clients

---

[2] Documents indicate that Mr. Scaramella was anticipating potential litigation with BPWCP even before May, 2013.

1   conduct a comprehensive and appropriate document search.  Id.; Knickerbocker v. Corinthian

2   Colleges, 298 F.R.D. 670, 678 (W.D. Wash. 2014).

3        From the outset of this case, Plaintiffs resisted all attempts by BPWCP to set forth

4   parameters for how electronic discovery would be conducted by the parties and refused to

5   agree on any type of protocol for electronic discovery.  Plaintiffs likewise refused to allow

6   BPWCP to have input into or be involved in any way in Plaintiffs' electronic discovery

7   processes.  As such, BPWCP served an interrogatory requesting that Plaintiffs explain their

8   electronic discovery process.  See Plaintiffs' Response to Interrogatory No. 17, attached

9   hereto as **Exhibit B**.

10       Plaintiffs' response to that interrogatory, however, was inadequate as it did not

11  explain the process used to choose responsive documents, which computers or electronic

12  devices were searched for responsive documents, which e-mail addresses were searched for

13  electronic documents, or who conducted the search.  Id.  Indeed, although Plaintiffs claimed

14  that "Everyone's e-mail (with an @azoilholdings.com email address) is backed up/stored on

15  the server," Plaintiffs' production established that many key employees, including Mr.

16  Scaramella, Mr. Andy Daziani, and Mr. Delery Guillory used gmail or AOL e-mail accounts

17  for their work, and not just the "@azoilholdings.com" e-mail accounts.

18       After repeated inquiries to Plaintiffs' counsel regarding the process they used for

19  preserving, collecting, and searching for documents responsive to BPWCP's discovery

20  requests, Plaintiffs provided the affidavit of Roberta (Bobbie) Lasan on December 24, 2014.

21  A copy of Ms. Lasan's affidavit is attached hereto as **Exhibit C**.  Ms. Lasan's affidavit is

22  wholly inadequate.  It does not answer basic questions regarding Plaintiffs' preservation,

collection, or search for relevant, responsive documents.  For example, Ms. Lasan's affidavit stated that certain "key word searches" were performed, but the "key words" used were not provided.  Id. at ¶ 4(b).  In addition, the affidavit seemed to indicate that certain folders on the small business server were not searched at all.  Id. at ¶ 4(c).  Also, the affidavit seemed to indicate that Plaintiffs' employees, including Mr. Scaramella, were the ones who searched for and determined which documents were relevant and responsive to BPWCP's discovery requests.  Id. at ¶ 5.

After reviewing Ms. Lasan's affidavit, BPWCP served a deposition notice for a corporate representative to testify regarding the preservation, collection, and search for documents.  A copy of the 30(b)(6) Deposition Notice is attached hereto as **Exhibit D**.  BPWCP also noticed the deposition of Mr. Mike Diebler, who was identified in the interrogatory response and in the Lasan affidavit as someone who had knowledge regarding the electronic discovery process followed by Plaintiffs.

**D.      Plaintiffs' Preservation, Collection, And Search For Documents.**

In January 2015, Ms. Lasan, the designated Rule 30(b)(6) deponent, testified at length regarding Plaintiffs' preservation and production efforts.  (Deposition of Bobbie Lasan dated Jan. 19, 2015 ("Lasan Dep."), relevant portions of which are attached hereto as **Exhibit E**.)  Mike Deibler, an employee of Plaintiffs in charge of tech support, also testified about Plaintiffs' general efforts to preserve, collect, and produce documents in this matter.  (Deposition of Mike Deibler, dated Jan. 20, 2015 ("Deibler Dep."), relevant portions of which are attached hereto as **Exhibit F**.)  Ms. Lasan and Mr. Diebler testified as follows:

- Plaintiffs did not issue a litigation hold notice in this case.  (Deibler Dep., 105:24-106:3; Lasan Dep., 148:7-23.)[3]

- Plaintiffs never provided its employees with any form of written protocol regarding the proper method to find responsive documents.  (Lasan Dep., 148:2-23.)

- Plaintiffs' employees were not provided any search terms for locating responsive documents, and those employees were never instructed or asked to search for electronically stored information ("ESI") on their home computer or any other computer that could be used in connection with Plaintiffs' businesses.  (Lasan Dep., 156:9-157:1, 174:16-20, 175:18-23; Deibler Dep., 114:8-19.)[4]

- Plaintiffs let their employees and former employees do their own preservation, collection, and search for documents and information with potential relevance to the claims and defenses in this case.  (Deibler Dep., 107:7-25.)[5]

- Each employee self-selected what documents, including electronically stored documents, to produce in response to BPWCP's discovery requests.  (Deibler Dep., 107:7-25.)  And each employee decided on their own whether or not to search the entire Arizona Oil Holdings server or only certain subfolders.  (Lasan Dep., 153:3-25.)

---

[3] In their May 31, 2013 letter, Plaintiffs instructed BPWCP "to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things and to act diligently and in good faith to secure and audit compliance with such litigation hold." (Exh. A1, at 3.)

[4] In May 2013, Plaintiffs recognized the obligation to search for and collect information from employees' home systems in the preservation letter they served on BPWCP:  "[Y]ou should also determine if any home or portable systems or devices may contain potentially relevant data.  To the extent that your employees have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must take reasonable measures to preserve the contents of such systems, devices and media used for these purposes." (Exh. A1, at 6.)

[5] Ironically, in May 2013, Plaintiffs' requested that BPWCP "guard against accidental, intentional and inadvertent deletion."  (Exh. A1, at 4.)  Plaintiffs informed BPWCP that its "officers, directors, employees or other may seek to hide, destroy or alter ESI" and requested BPWCP to "act reasonably to prevent and guard against such actions." (Id.)  As Mr. Stevens stated, "[t]his concern is not unique to [BPWCP].  It is simply conduct that occurs with such regularity in litigation that case law throughout the country has established that any custodian of ESI and their counsel must anticipate and guard against its occurrence." (Id.)

- Mr. Deibler testified that he did not conduct any keyword searches on Plaintiffs' shared drive to locate responsive documents.   Instead, he manually reviewed documents in particular folders located on Plaintiffs' small business server and provided the documents in those folders to Plaintiffs' attorney. (Deibler Dep., 76:13-78:18.)

- Mr. Deibler was tasked with finding documents responsive to BPWCP's discovery requests, including agreements, but Mr. Deibler is not a lawyer and had never read or seen any of the agreements on which Plaintiffs base their breach of contract claims. (Deibler Dep., 43:15-19, 44:9-19, 77:5-11, 94:11-14).  In fact, when asked how he knew he was obtaining all of the relevant agreements for the case, Mr. Deibler testified he was relying on "faith." (Id. at 77:16-78:2.)

**E.     Plaintiffs' Failures to Preserve and Produce Documents.**

After Ms. Lasan and Mr. Diebler were deposed, BPWCP deposed key employees of Plaintiffs who were significantly involved in Plaintiffs' Arizona operations.   Those employees testified as follows:

*1.   Plaintiffs' Chief Financial Officer, Chris Olson.*

Plaintiffs' primary financial officer, Chris Olson, testified on January 29, 2015 regarding his collection and preservation of documents and information in this case. (Deposition of Chris Olson ("Olson Dep."), dated Jan. 29, 2015, relevant portions of which are attached hereto as **Exhibit G**.)  Critically, he testified as follows:

- Mr. Olson testified that he was not asked to collect email correspondence:

      Q:  Were you asked to collect email correspondence?

      A:  I don't recall doing that.  (Id. at 54:2-3; 55:3-6.)

- Mr. Olson testified that on his own volition, he reviewed emails related to the S2K and Retalix for his own edification, but he could not recall if he provided those emails to Mr. Scaramella and he did not review emails on any other potentially relevant issues:

Q:  Did you provide all the items from [your Retalix and S2K email] folder to Mr. Scaramella or just specific items you pulled out?

A:  I'm trying to remember if I actually gave him -- I don't recall exactly physically handing him a printout of it, but I told him what was in the emails.  And so I guess, yes, I did provide him with the information but maybe not in a hard copy.

* * *

Q:  And other than that very specific search, did you look back at any of your other emails related to the work you did for Arizona Oil Holdings for potentially providing for this -- related to this case?

A:  I really don't remember.  Those were the main ones that I -- I thought were applicable to the -- to what the damages were that we were claiming.

(Id. at 55:24-56:5; 56:18-24.)

- Mr. Olson testified that he regularly deleted emails in his Arizona Oil Holdings email account, and no one ever told him to stop deleting emails:

Q:  Was it your practice to -- to delete those emails or did they just sort of hang around indefinitely?

A:  I deleted them.  I -- I would have thousands in there and every once in a while I would delete them.

Q:   Were you ever told by anyone to preserve your emails and not -- stop deleting them?

A:   No.

(Id. at 70:21-71:3.)

- Mr. Olson testified that he updated the source documents for Plaintiffs' most recent

Amended Supplemental Disclosure Re: Damages, but those documents were not

produced either and Mr. Olson could not testify without the documents in front of

him:

Q:  Have we talked about all the work that you've done related to the preparation of damage disclosures in this case?

A:   I believe so.  I mean, the underlying documentation, the financials that were created over a number of years, I don't believe we've touched on that.  But certainly that's the source data that was used to prepare the supplemental schedules, which then prepared the damage claim.

* * *

Q:   And that Excel spreadsheet would show the source of all of the numbers that are reflected in the amended supplemental disclosure regarding damages?

A:   They would not have all of the numbers on that were in the supplemental amended.  It would have mainly the margin loss calculation and then the franchise fees, royalties.  I'd really have to see it again to - - to give you a complete answer on that, but that's what I recall.

(Id. at 23:16-23:24; 26:2-10.)[6]

• Mr. Olson further testified that the only financial documents he produced or provided to Mr. Scaramella were those used to prepare the original damage calculations:

Q:   Okay.  What did you do to collect documents to be produced in this matter?

A:   Well, it would be basically downloading off of our accounting system different financial reports, giving those financial reports either to Russ or possibly to counsel, anything from a financial nature that was requested of me I would have been providing that.

Q:   Were you given specific direction about what documents to provide, or were you just given parameters and told to go look and collect the documents?

A:   Well, it would have been specific to prepare Exhibit 1.  There were specific documents I would have had to have looked at, the balance sheets and income statements, to be able to prepare that schedule.

(Id. at 53:6-20.)

---

[6] Counsel disagreed at the deposition whether those documents had been produced, but counsel for Plaintiffs had no meaningful response when counsel for BPWCP noted that Plaintiffs have not produced anything since January when the Amended Supplemental Disclosure Statement Re: Damages was created.  (Olson Dep., 26:11-27:25.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

- Despite only providing to Mr. Scaramella balance sheets and income statements to prepare the damages exhibits, Mr. Olson admitted that monthly financials exist and are available, but were not produced, which would demonstrate the profitability and financial health of each station:

> Q:   You talked about the monthly financial statements you would prepare and send to Mr. Scaramella at the beginning of each month.  Do you remember that discussion?
>
> A:   Yes.
>
> Q:   And I think you said you used the Peachtree system for the Arizona sites?
>
> A:   Yes.
>
> Q:   Are those monthly financials still available - -
>
> A:   Yes.
>
> Q:    - - on that system?
>
> A:   Yes.
>
> Q:   Okay.   Are those the documents that I would want to look at on a monthly basis to see the profitability and financial health of each station?
>
> A:   Yes.
>
> (Id. at 68:3-18.)

- Finally, Mr. Olson testified that he had a file of notes relating to various meetings he would have regarding ARCO, conversations with banks, etc., but Mr. Olson never collected notes related to a meeting he had with Russ Scaramella and BPWCP personnel about the Arizona operations and that he was never asked for those notes:

> Q: And I presume, based on our earlier conversation, no one asked you to collect those notes for production in this lawsuit?
>
> A: I don't recall that, yep.
>
> (Id. at 173:3-177:18.)

Page 11

2.  *Plaintiffs' General Manager, Andy Daziani.*

Mr. Andy Daziani, Plaintiffs' general manager for all of their Arizona stations, was deposed on January 21, 2015.  (Deposition of Andy Daziani, dated Jan. 21, 2015, ("Daziani Dep."), relevant portions of which are attached hereto as **Exhibit H**.)  Mr. Daziani admitted to having a large amount of documents related to Plaintiffs' Arizona operations that Mr. Scaramella knew about but that were not requested, collected, or produced by Plaintiffs:

- Mr. Daziani testified that Plaintiffs' tech support employee, Mike Diebler, was the only person who contacted him regarding collecting documents, and Mr. Daziani testified that Mr. Diebler only requested documents relating to S2K and Retalix issues, not any other issues in the case:

    Q:  Okay. So Mike Deibler called you and asked you for all emails that pertained to Retalix or S2K?

    A:  I believe so, yes.

    Q:  Anything else he asked you to collect?

    A:  No.

    * * *

    Q:  What you did is you gave Mike Diebler remote access to your home PC?

    A:  Yes.

    * * *

    Q:  And where did you tell him to look for these emails?

    A:  Well, I actually went into my computer and exposed it to him and he was already in, and I told him what file to go to and he started emailing himself these files.

    * * *

Q:  Did you look anywhere else or collect anything else that might be related to Retalix or S2K for Mike Deibler?

A:  No.

Q:  Did anyone else contact you about collecting documents related to your employment at Arizona Oil Holdings?

A:  No.

   (Id. at 13:8-21, 14:12-14; 14:18-23; 15:13-20.)

- Mr. Daziani next admitted that he saved everything related to his work for Arizona Oil Holdings on five thumb drives that Mr. Scaramella knew about but that were not collected or produced:

Q:  . . . You saved everything related to your - -

A:  Everything.

Q:  - - work?  How did you save it?

A:  Thumb drives.

Q:  Do you still have those thumb drives?

A:  All of them.

Q:  Did you give those thumb drives to Mr. Scaramella or Mr. Diebler?

A:  No.  I have them.

Q:  Did those thumb drives contain things related to your employment at Arizona Oil Holdings other than the items that were in your S2K and Retalix folders?

A:  Absolutely.

Q:  What kinds of things would be - - would be on those thumb drives?

A:  Wow, everything.  All - - operationally, all of my spreadsheets.  I create - - I am an - - I am an analyst also.  So I analyzed everything for us.  And I still have everything that I analyzed.

Q:  What types of things were you analyzing?

A.   Wow, coffee programs, condiment bars.  I kept track of tomatoes and lettuce and pickles and relish.

Q:   Anything else?  Or was it all item level things at this convenience store?

A:   Everything that had to do with our business I - - I - -

Q:   Anything - -

A:   - - analyzed.

Q:   Anything related to gasoline sales or pricing?

A:   Oh yeah.

(Id. at 17:18-18:23.)

Q:   And how many thumb drives are we talking about?

A:   Probably five.

Q:   Is there anything else on those thumb drives that you can remember?

A:   Well, just everything that has do to with our business and just - - you know, I mean I have - - I have so many spreadsheets that I created, probably thousands.

(Id. at 24:20-25:1.)

Q:   Are these spreadsheets and this information and this data, is it anywhere else or is it only on those flash drives?

A:   No, I think they're only on the flash drives.

Q:   Does Mr. Scaramella know about this - - about the fact that you have this information on these flash drives?

A:   Oh, sure.

Q:   But you weren't asked for it to produce in this lawsuit?

A:   No.

(Id. at 30:8-18.)[7]

---

[7] Ironically, Plaintiffs' May 31, 2013 letter specifically identifies "thumb drives" as potential sources of information employees may have in their possession:  "[Y]ou must take reasonable measures to preserve the contents of such [home] systems, devices and media used for these purposes (including not only potentially relevant date from portable and home

(continued . . .)

1

2

- Mr. Daziani further testified that he deleted a significant amount of emails from the
  AOL account that he used for Plaintiffs' business purposes during the pendency of

3

4

this action, including a document created by the creator of S2K, Nick Otter, which

5

was emailed to Mr. Daziani:

6

Q.   Which email account would he have sent you that information at?

7

A.   It's probably my AOL but I erased everything.

8

Q.   You erased everything in your AOL account?

9

10

11

12

13

A.   Well, old emails that didn't pertain to – you know, I might have this still.
     I don't even know.  Here's what I did. I cleaned up -- I know you're
     going to think I'm nuts, but I'm anal about things like OCD. And I had to
     get rid of -- I had to get rid of stuff that I didn't want anymore. So I
     started deleting everything.  Because I was having issues with – it's a
     long story.  But anyways, I deleted a lot of things as far as emails that
     were sent to me not saved in files just emails. So -- so it -- it would
     probably be in my AOL.

14

Q.   When did you do this cleaning up of your email and deleting of the stuff?

15

16

A.   Oh, probably a couple months ago, you know. But I'm not saying he
     didn't send it to me. There's probably a good chance that he did. I just
     don't remember it.  Because you got to remember, this was back in 2009;
     I mean, six years ago, I believe.

17

(Id. at 111:15-112:11.)[8]

18

19

20

---

21

22

(. . . continued)
computers, but also from **portable thumb drives**, CDR/DVD-R disks and the user's PDA,
smart phone, voice mailbox, and other forms of ESI storage.)."  (Exh. A1, at 6.) (emphasis
added)

23

24

25

[8]  The May 31, 2013 preservation letter also described the obligation to preserve
browser-based email accounts:  "[I]f you used online or browser-based e-mail accounts or
services (**such as Gmail, AOL**, Yahoo Mail or the like) to send or receive potentially relevant
messages and attachments, the contents of these account mailboxes (including Sent, Deleted,
and Archived Message folders) **should be preserved**."  (Exh. A1, at 6.) (emphasis added)

26

1
2
3
4
5

- Mr. Daziani also testified that he worked with an analyst, Mr. Darius Ingram, who was employed by Arizona Oil Holdings, LLC. (<u>Id.</u> at 205:21-209:3.) Mr. Ingram would create reports for Mr. Scaramella and, as Mr. Daziani testified, Mr. Ingram had a "hand on pretty much everything." (<u>Id.</u>)

6

### 3. *Plaintiffs' Assistant General Manager, Tracy Johnson.*

7
8
9
10
11
12
13
14
15
16
17

Another key employee of Plaintiffs, Tracy Johnson, who was an assistant general manager for Plaintiffs' Arizona operations and the employee primarily responsible for Arizona station operations and setting the retail price for gasoline after 2009, testified that she was never contacted about collecting documents in her possession associated with the case. (Deposition of Tracy Johnson, dated Jan. 22, 2015, relevant portions of which are attached hereto as **Exhibit I**, at 39:3-5.) In fact, she testified that she had a personal Gmail account containing work emails that she closed in 2013 when she stopped working for Arizona Oil Holdings. (<u>Id.</u> at 39:11-40:3.) No one ever told her to preserve any of her documents or emails associated with her work at Arizona Oil Holdings. (<u>Id.</u> at 40:7-10.) As a result, she lost all of her work emails in her Gmail account. (<u>Id.</u> at 40:4-6)[9]

18

## II.    LEGAL STANDARD.

19
20
21

The Court has discretion to sanction a party who causes the spoliation of evidence. See <u>Leon v. IDX Sys. Corp.</u>, 464 F.3d 951, 958 (9th Cir. 2006).[10] Destruction of evidence or

22
23

[9] Throughout the discovery process in this case, counsel for BPWCP has attempted to consult with Plaintiffs' counsel to cure the deficiencies. (<u>See</u> Statement of Lizabeth Conran, attached hereto as **Exhibit J**.)

24
25
26

[10] This Court's authority to sanction a party for discovery misconduct, including the failure to preserve or produce documents, is both statutory and inherent. <u>Leon</u>, 464 F.3d at 958. Indeed, the Court need not find that a party violated a discovery order to impose

(continued . . .)

the failure to preserve property for another's use as evidence in pending litigation constitutes spoliation. See Pettit v. Smith, No. CV-11-02139-PHX-DGC, 2014 WL 4425779, at *4 (D. Ariz. Sept. 9, 2014). Specifically, failure to "preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." Surowiec v. Capital Title Agency, Inc., 790 F. Supp. 2d. 997, 1005 (D. Ariz. 2011) (quoting Thompson v. U.S. Dept. of Housing & Urban Dev., 219 F.R.D. 93, 100 (D. Md. 2003)).

"A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence[.]" Surowiec, 790 F. Supp. 2d at 1005 (quoting Goodman v. Praxair Servs., Inc., 632 F. Supp. 2d 494, 509 (D. Md. 2009)).

## III. PLAINTIFFS FAILED TO PRESERVE AND DESTROYED RELEVANT DOCUMENTS.

### A. Plaintiffs Had a Duty To Preserve Documents as Early as May 2013.

A duty to preserve information arises when a party knows or should know that the information is relevant to pending or future litigation. See Surowiec, 790 F.Supp.2d at 1005. The duty to preserve is triggered not only when litigation actually commences, "but also

---

(. . . continued)
sanctions. Id. Instead, it may rely on the inherent power of federal courts to levy sanctions in response to abusive litigation practices. Id.

extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." Id.

The duty to preserve requires litigants to take affirmative actions, such as placing a litigation hold on various types of documents, in order to ensure that documents will be preserved.  See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y.2003).[11] That obligation also "requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials."  Nat'l Ass'n of Radiation Survivors v. Turnage, 115 F.R.D. 543, 557-58 (N.D. Cal. 1987).   This includes former employees who may have relevant documents.  See, e.g., Export–Import Bank, 233 F.R.D. at 341–42 (holding that a corporation must exhaust the practical means at its disposal to obtain documents in the possession of former employees).[12]

This is Plaintiffs' and Mr. Scaramella's lawsuit.  They are seeking millions of dollars in damages from BPWCP.  It is indisputable that Plaintiffs and their counsel anticipated litigation with BPWCP at the latest in May 2013.  (Exh. A1; Deposition of Russ Scaramella, Vol. II, relevant portions of which are attached as **Exhibit K**, at 100:18-21.)  At that time, or earlier, Plaintiffs should have issued a litigation hold and communicated with their

---

[11] As Plaintiffs' May 31, 2013 letter states:  "[A]dequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. . . .  Preservation requires action."  (Exh. A1, at 3.)

[12] Mr. Stevens preservation letter to BPWCP similarly describes the duty with respect to former employees:  "[Y]ou must notify any current *or former* agent, attorney, **employee**, custodian and contractor or third party in possession of or having access to potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance."  (Exh. A1, at 7.) (emphasis added)

1
2
3
4
5
6
7
8
9
10

employees and former employees regarding their obligations to preserve evidence.  Indeed, the key employees that have been discussed in this motion all worked on and had documents related to the financial operation and condition of Plaintiffs during the relevant periods for which Plaintiffs seek damages.  Instead, Plaintiffs failed to issue a litigation hold at any time, and Plaintiffs failed to communicate preservation instructions to its employees and individuals they knew had relevant documents.  (Deibler Dep., 105:24-106:3; Lasan Dep., 148:7-23.)  Plaintiffs simply allowed their employees and former employees to haphazardly determine what information could be destroyed rather than preserved, leaving an untold number of documents uncollected and unproduced.

11
12

**B.    Plaintiffs Acted Culpably By Failing to Preserve and Collect Relevant Evidence.**

13
14
15
16
17
18
19
20

The failure to comply with the duty to preserve is, at a minimum negligent, and may be deemed grossly negligent, reckless, or willful.  In re Napster, Inc. Copyright Litig., 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (citing Zubulake, 220 F.R.D. at 220).  The "abject failure to preserve an entire source of evidence is sanctionable conduct." Napster, 462 F. Supp. 2d at 1074.[13]  Importantly, the failure to issue a litigation hold typically constitutes gross negligence.  Id.  ("At best, however, Hummer was grossly negligent in executing its duties to preserve evidence, by failing to implement a litigation hold . . .").

21
22
23

There is no justification for Plaintiffs failure to issue a litigation hold in a case they anticipated filing a year before doing so seeking hundreds of millions of dollars in damages.

24
25

_____

[13] Indeed, case law makes clear that regarding the culpability element, only fault or simple negligence is required for the imposition of sanctions.  Ortega Melendres v. Arpaio, No. CV-07-2513-PHX-GMS, 2010 WL 582189, at *5 (D. Ariz. Feb. 12, 2010).

26

For that reason alone, Plaintiffs' failure to preserve relevant evidence and the imposition of sanctions is warranted. Id.; Surowiec, 790 F. Supp. 2d at 1007 (although not per se evidence of culpable conduct, "the failure to implement a litigation hold [is] an important factor in determining culpability").

Moreover, Plaintiffs were "grossly negligent" and "reckless" because interested persons were allowed to self-select responsive documents in violation of the duty to preserve. Northington v. H&M Intern., No. 08-CV06297, 2011 WL 663055, *17-18 (N.D. Ill. Jan. 12, 2011). "It is unreasonable to allow a party's interested employees to make the decision about the relevance of such documents, especially when those same employees have the ability to permanently delete unfavorable email from a party's system." Jones v. Bremen High Sch. Dist. 228, No. 08 C 3548, 2010 WL 2106640, at *7 (N.D. Ill. May 25, 2010) (granting motion for sanctions for violation of duty to preserve documents). "Simply accepting whatever documents or information might be produced by [a litigant's] employees" is improper, as most employees lack the legal knowledge to determine relevance and employees are reluctant to reveal their mistakes. Id. (citing Cache La Poudre Feeds, L.L.C. v. Lan O'Lakes, Inc., 244 F.R.D. 614, 630 (D. Colo. 2007)) (internal quotation omitted); Knickerbocker v. Corinthian Colleges, 298 F.R.D. 670, 679 (W.D. Wash. 2014) ("Such self-selection of a limited pool of discovery materials, combined with doubt as to what searches, if any, were performed of this pool of materials, gives the court no confidence in the quality of [the defendant's] discovery production.").

Moreover, Plaintiffs charged employees without legal training with the preservation and production of ESI, but failed to provide any protocol for Plaintiffs' employees to follow.

Specific examples of Plaintiffs' unacceptable conduct are numerous, as described in Section I of this Motion.  Notably, Andy Daziani testified that he deleted a significant amount of emails from the AOL account that he used for business purposes around November, 2014, and he further testified that he had the only copy of "thousands" of documents related to the Plaintiffs' business that Plaintiffs' manager, Russ Scaramella, knew about but never asked for and never produced.  (Daziani Dep., 24:20-25:1; 30:8-18; 111:15-112:11.)  Bobbie Lasan testified that Plaintiffs never bothered to ask their employees to search for ESI on their home computers, or any other computer that could have been used in connection with Plaintiffs' businesses.  (Lasan Dep., 174:16-20, 175:18-23.)  Tracy Johnson confirmed this, testifying that she was never asked to preserve or collect emails from a Gmail account she used extensively for work and has since deleted those emails.  (Johnson Dep., 39:11-40:10.)  And Plaintiffs' CFO, Chris Olson, admitted that he was never asked to search or produce any documents from his email, including monthly emails to Russ Scaramella attaching monthly balance sheets and financial statements that have, likewise, not been produced despite being in senior management.  (Olson Dep., 55:24-56:5; 56:18-24.)  Mr. Olson further testified that he deleted emails on topics relevant to issues in the case because no one told him to stop deleting e-mails.  (Id. at 70:21-71:3.)

Plaintiffs' admitted deletion of and failure to review and preserve relevant ESI is direct evidence of bad faith, willfulness, or fault, regardless of whether Plaintiffs claim innocence or negligence.  Leon, 464 F.3d at 959 ("One who knows or should know that evidence is relevant to potential litigation, but deletes it, exhibits bad faith, willfulness, or fault sufficient for a dispositive sanction.")  As the court in Knickerbocker stated:

1
2
3
4
5

> [T]he court finds, by clear and convincing evidence, that Corinthian's and Corinthian's counsel's lackluster search for documents, failure to implement a litigation hold, deletion of evidence, refusal to cooperate with Plaintiffs in the discovery process . . ., reliance on a recklessly false declaration, shifting litigation positions, and inaccurate representations to the court constitute bad faith or conduct tantamount to bad faith.

6   Knickerbocker, 298 F.R.D. at 681.

7       The totality of Plaintiffs' preservation and production conduct – deleting relevant

8   documents during the pendency of the action, failing to issue a litigation hold at any time,

9   and failing to collect relevant documents from employees or providing employees with any

10  instruction whatsoever as to their preservation obligations – certainly rises to the level of

11  culpable conduct for the imposition of sanctions.[14]  Id. at 678 (finding that a party and their

12  counsel "refused to participate forthrightly in the discovery process and that this refusal

13  constitutes or is tantamount to bad faith").  Further, this conduct has been to the detriment of

14
15  BPWCP's ability to defend itself against the Plaintiffs' allegations.

16      **C.    The Documents Plaintiffs Failed to Preserve and Produce Are Relevant to
17              the Claims and Defenses of BPWCP.**

18      The relevance of the documents Plaintiffs failed to preserve and have deleted cannot

19  be ascertained because those documents no longer exist, and Plaintiffs are precluded from

20  arguing that the deleted and unproduced documents are irrelevant.   Leon, 464 F.3d at 959

21  ("[B]ecause ¬the relevance of . . . [destroyed] documents cannot be clearly ascertained

22

---

23      [14] Plaintiffs acknowledge that the failure take reasonable steps to preserve relevant
    evidence is sanctionable conduct: "Should your failure to preserve potentially relevant
24  evidence result in the corruption, loss or delay in production of evidence to which [Plaintiffs]
    are entitled, *such failure would constitute spoliation of evidence, which could result in*
25  *serious sanctions* . . ." (Exh. A1, at 7.) (emphasis added)

26

because the documents no longer exist," a party "can hardly assert any presumption of irrelevance as to the destroyed documents."6)

In any event, the record demonstrates that at least some of the documents Plaintiffs failed to preserve or collect are relevant to BPWCP's claims and defenses.  Relevance under the Federal Rules is a broad concept.  Fed. R. Evid. 401.

Notably, Mr. Daziani, Mr. Olson, and Ms. Johnson, Plaintiffs three key employees with information relevant to the Arizona stations, each testified that they deleted emails related to their work for Plaintiffs, which is directly at issue in this lawsuit.  In addition, Chris Olson testified that he had monthly income statements and balance sheets he created and sent to Mr. Scaramella each month upon which Mr. Scaramella relied in running the business. (Olson Dep., 68:3-18.)  Plaintiffs' lack of production of these financial documents and spreadsheets of analyses done on the financial condition of the stations prejudiced BPWCP in that BPWCP could not adequately depose Plaintiffs' 30(b)(6) witness regarding Plaintiffs' financials.  Indeed, Mr. Olson, who was the witness who would presumably be Plaintiffs' 30(b)(6) witness regarding Plaintiffs' financials, was the person who knew about and could testify regarding the very financial documents that were not produced.

Those documents are directly responsive to BPWCP's First Request for the Production of Documents No. 13 but were not produced by Plaintiffs.[15]  Likewise, Mr. Daziani's spreadsheets and Mr. Ingram's analysis as to financial condition of the stations

---

[15]  BPWCP's First Request for Production of Documents, No. 13 requested: "All financial statements (audited and unaudited); balance sheets; income statements; statements of profit or loss; computerized financial data . . . or other documents of any description whatsoever referring or relating to or setting forth the actual or potential financial condition and credit worthiness of Plaintiffs and each of the Named Stations . . ."

1  were not produced.  There can be no dispute that these documents are relevant to the claims
2  and defenses in this case.

3  **IV.     SANCTIONS ARE WARRANTED FOR PLAINTIFFS' CONDUCT.**

4          "Sanctions that a federal court may impose for spoliation include assessing attorney's
5  fees and costs, giving the jury an adverse inference instruction, precluding evidence, or
6  imposing the harsh, case-dispositive sanctions of dismissal or judgment." United States v.
7  Town of Colorado City, Ariz., No. 3:12-CV-8123-HRH, 2014 WL 3724232, at *7 (D. Ariz.
8  July 28, 2014).   The Court has discretion to impose spoliation sanctions, but it "must
9  determine which sanction best (1) deters parties from future spoliation, (2) places the risk of
10 an erroneous judgment on the spoliating party, and (3) restores the innocent party to their
11 rightful litigation position." Aviva USA Corp. v. Vazirani, No. CV 11-0369-PHX-JAT, 2012
12 WL 71020, at *7 (D. Ariz. Jan. 10, 2012); Town of Colorado City, 2014 WL 3724232, at *7.

13         To impose a sanction in the form of attorneys' fees, the court must make an express
14 finding that the sanctioned party's behavior constituted or was tantamount to bad faith.
15 Vazirani, 2012 WL 71020, at *8.  "A party demonstrates bad faith by delaying or disrupting
16 the litigation or hampering enforcement of a court order." Id.

17         As demonstrated above, Plaintiffs' conduct of failing to preserve and deleting
18 relevant evidence constitutes bad faith.  Thus, sanctions such as precluding evidence, and/or
19 striking pleadings are warranted in this case.  Also, other, non-case dispositive sanctions –
20 such as amending the case management order, ordering the payment of attorneys' fees, and
21 allowing BPWCP to conduct additional discovery and an adverse inference instruction – may
22 be imposed. Pettit, 2014 WL 4425779, at *13.

Page 24

1

2

3

**<u>CONCLUSION</u>**

For the reasons outlined above, BPWCP requests that this Court enter an Order preventing Plaintiffs from presenting any evidence of damages identified in Plaintiffs' Amended Supplemental Disclosure Statement Re: Damages for Lost Fuel Margin for Plaintiff sites.   Additionally, BPWCP requests it be awarded its reasonable costs and attorneys' fees associated with this Motion.

If the Court deems the above proposed sanction as inappropriate at this juncture, BPWCP requests that the Court enter an Order: (1) that Plaintiffs re-do electronic discovery using appropriate procedures, including collecting electronic documents and e-mails from its current and former employees, utilizing necessary search terms agreed upon by the parties if necessary, reviewing those documents for responsiveness and privilege and, and producing those documents in a searchable electronic format; (2) amending the Case Management Order to allow BPWCP additional time to continue to conduct discovery, including specifically, taking the 30(b)(6) deposition of Plaintiffs, the deposition of Darious Ingram, and the depositions and re-deposing certain key witnesses; (3) requiring Plaintiffs to pay for BPWCP's costs and expenses, including attorneys' fees, associated with re-deposing witnesses; (4) an adverse inference instruction be given at trial regarding Plaintiffs' failure to preserve and produce relevant documents; and (5) BPWCP be awarded its reasonable costs and attorneys' fees in preparing this Motion and pursuing Plaintiffs' incomplete discovery practices.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Dated this 10th day of February, 2015.

GREENSFELDER, HEMKER & GALE, P.C.

_____/s/ Lizabeth Conran_____
Lizabeth M. Conran, *pro hac vice*
lmc@greensfelder.com
David M. Harris, *pro hac vice*
dmh@greensfelder.com
David Simmons, *pro hac vice*
ds@greensfelder.com
10 S. Broadway, Suite 2000
St. Louis, MO  63102
Phone:  (314) 241-9090
Fax:  (314) 345-5488

***Attorneys for Defendant BP West Coast Products LLC***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served upon the following counsel of record by electronic transmission 10th day of February, 2015:

Don Stevens, Esq.
Law Office of Don Stevens P.C
15433 N. Tatum Blvd., Suite 106
Phoenix, AZ 85032
don@donstevenslaw.com

***Attorney for Plaintiffs***

_____/s/Lizabeth Conran_____

1522472